An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-14

Filed 3 December 2025

Cleveland County, Nos. 22CR051218-220, 22CR000532-220, 22CR000533-220, 23CR000829-220

STATE OF NORTH CAROLINA,

v.

RODERICK JERMAINE YOUNG, Defendant.

Appeal by Defendant from judgment entered 6 December 2023 by Judge William R. Bell in Cleveland County Superior Court. Heard in the Court of Appeals 27 August 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Michael Bulleri, for the State.*
>
> *Attorney Marilyn G. Ozer for Defendant-Appellant.*

MURRY, Judge.

Roderick J. Young (Defendant) appeals from judgment entered upon jury verdicts of murder, possession of firearm by felon, and obtaining habitual felon status. Defendant argues that the trial court erred by admitting certain expert and lay testimony at trial. For the following reasons, this Court holds that the trial court did not plainly err.

### I.    Background

This case arises out of a series of shootings that lasted for approximately two minutes in the early morning of 2 April 2022 at Skooterz Bar and Grill in Shelby (the bar). Defendant's charges arise from the third shooting, which resulted in the death of Zechariah Freeman (the victim).

Footage from multiple security cameras around the area suggests the following sequence of events: At approximately 11:08 PM on 1 April 2022, the victim and Calvin Gullatte arrived at the bar. The victim wore black-and-white striped pants and a blue sweatshirt. Shortly thereafter, Defendant and his brother Charlie Byers arrived. Defendant wore a long-sleeved hooded white shirt. Around 12:30 AM, the victim and Gullatte exited the bar and walked past a crowd of people in the parking lot. After a brief exchange, Gullatte and the group began shooting at one another. Around the same time, Defendant and two others exited the bar on the opposite side of the building and began walking towards Byers's car in the parking lot. Once the gunfire began, they hid behind another car. The victim concurrently ran through the parking lot as another dark-colored car drove past him and fired a gunshot,[1] at which point he abruptly stopped, turned around, and started running in the opposite direction. Moments later, Defendant stood next to Byers's car, extended his arm, and fired five gunshots in the victim's direction. The victim collapsed after the first shot. Byers's

---

[1]    The surveillance video indicates any gunshots as muzzle flashes. For simplicity, we interpret these muzzle flashes as gunshots and refer to them accordingly throughout.

car drove away after the fifth shot.

On 16 May 2022, a grand jury indicted Defendant for first-degree murder and possession of firearm by felon. On 23 October 2023, a grand jury indicted Defendant for obtaining habitual-felon status. At trial on 27 November 2023, the State argued that Defendant shot and killed the victim. On the contrary, Defendant argued an individual in the dark-colored vehicle that drove past him in the video shot the victim nearly 30 seconds earlier. Ultimately, the parties disputed whether Defendant or an individual in the dark-colored vehicle fired the fatal gunshot.

At trial, the State introduced surveillance footage and Byers's testimony identifying Defendant therein. Testifying for the State, Detective Jacob Tallent used the video to explain "where [Defendant] went, from the time he arrived [at the bar] to the time he left." As the State played the video for the jury, Detective Tallent narrated in relevant part:

> DETECTIVE TALLENT: . . . Defendant was the only one wearing white long sleeves. It stands out later in the video. There is the shooting on the other side. And you can see Defendant go to the passenger side of the vehicle.
>
> STATE: Okay. In the front or the back?
>
> DETECTIVE TALLENT: It appears to be the front passenger.
>
> STATE: Are those muzzle flashes in the back?
>
> DETECTIVE TALLENT: There are muzzle flashes in the back right here in this direction . . . where Gullatte and the victim appear from in a few seconds. They are walking through. You see the interior light on in the vehicle. This is the victim and Gullatte. The subject in the front

passenger gets out and his arm extends with a white sleeve and you see the victim fall.

STATE: Okay. Let me slow down that whole sequence.

DETECTIVE TALLENT: There's the muzzle flash back here. Defendant appears to get into the front passenger side of the vehicle and the interior light comes on. And you can see the victim and Gullatte running through the cars right here. The subject gets out of the passenger side, arm extends, gunfire, and the victim falls and a couple more shots on the ground.

(Brackets omitted.) Defense counsel then cross-examined him as follows:

DEFENSE COUNSEL: Okay. We see the back lights come on that car and you saw the gunfire in the upper right hand corner. I believe that shadow right here was the victim running between two cars?

DETECTIVE TALLENT: Yes.

DEFENSE COUNSEL: And the victim abruptly turns and goes back the other way back to where Gullatte was. And the car begins to back out and the victim goes into a sprint right there. And the car turns behind him. Do you notice that the victim turns and looks at the car?

DETECTIVE TALLENT: I cannot tell where he is looking.

DEFENSE COUNSEL: Okay. It is hard to tell because it is blurry. There is the victim and he begins to turn and he starts to go back the other way and you see their reflection on top of the car. What about that gunshot?

DETECTIVE TALLENT: Where are you referring to?

DEFENSE COUNSEL: Right there from the car.

(Brackets omitted.) The State also played the video for Detective Matthew Styers, who testified in part that "the shooter, Defendant, st[oo]d[ ]" with his arm "[o]utside the vehicle." Defendant did not object to either detective's testimony at any point.

The State also presented expert testimony from medical examiner Dr. James

- 4 -

Lozano. Prior to trial, Dr. Lozano created two autopsy reports, arriving at different conclusions as to the bullet's directionality. During the trial and outside the presence of the jury, Defendant objected and moved to exclude Dr. Lozano's testimony under North Carolina Rule of Evidence 702. During voir dire, Dr. Lozano testified that his first autopsy report concluded that the fatal gunshot entered the victim's lower chest and exited mid-back, while his second report concluded that it entered through the back and exited out the front, indicating the bullet had come from the opposite direction as before. He explained that he changed his opinion based "on viewing the security footage at the time when [the victim] collapsed and did not get up after that." The trial court denied Defendant's motion and qualified Dr. Lozano as an expert in forensic pathology, reasoning that "the fact that there are two autopsies is fertile ground for cross-examination and that a mistake was made."

Dr. Lozano opined as to the bullet's directionality on direct examination, testifying that the shots were "all occurring from the same proximity[,] so it is likely it occurred from" the gunshots coming from Defendant's direction. On cross-examination, Dr. Lozano admitted to the following:

- Despite being unsure of directionality after the first autopsy, he originally "said the chest wound was the entrance wound";
- After signing his first autopsy report, he "believed it was more likely than not that the entrance was on the left lower chest";
- He "may have said that [he] guessed" in making his first finding; and
- The victim's exit wound could also be an entrance wound.

Additionally, after Defendant played the video, Dr. Lozano admitted to seeing a

muzzle flash from the dark-colored car driving past the victim and agreed that a shot from the car also would be consistent with his findings. Defendant adduced no evidence in his own defense. The trial court instructed the jury, in relevant part, according to N.C.P.I.—Crim. 104.94, explaining that, while they should "consider" Dr. Lozano's expert testimony, they "are not bound by it" and "are not required to accept [his] opinion to the exclusion of the facts and circumstances disclosed by other testimony." N.C.P.I.—Crim. 104. On 6 December 2023, the jury convicted Defendant of first-degree murder, possession of firearm by felon, and obtaining habitual-felon status. The trial court sentenced Defendant to life in prison without the possibility of parole. Defendant timely appealed.

## II. Jurisdiction

This Court has jurisdiction over Defendant's appeal from the trial court's final judgment under N.C.G.S. §§ 7A-27, 15A-1444. *See* N.C.G.S. § 7A-27(b) (2025) (final judgment of a trial court); *id*. § 15A-1444(a) (pled not guilty but found guilty).

## III. Analysis

On appeal, Defendant argues that the trial court erred (1) by allowing "Dr. Lozano's opinion that shots fired from the vicinity of Defendant's vehicle killed the victim . . . as the opinion was based on viewing security footage . . . which was both outside" his expertise "and invaded the province of the jury" and (2) by "allowing detectives to instruct the jurors on what they should be seeing in a gray-tone and murky video." He claims that the question of the video's "discernab[ility] . . . was properly in the province of the jury." For the following reasons, this Court holds that

the trial court did not plainly err on either count.

We review preserved challenges to the admission of opinion testimony only for abuse of discretion, *State v. Faulkner*, 180 N.C. App. 499, 512 (2006), "so arbitrary that it could not have been the result of a reasoned decision," *State v. Hennis*, 323 N.C. 279, 285 (1988). Absent a timely objection, though, this abuse must also be a plain error. *State v. Gregory*, 342 N.C. 580, 584 (1996). To show plain error, "a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence*, 365 N.C. 506, 518 (2012). Plain error occurs only when, "absent that evidence, the jury probably would have returned a different verdict." *State v. Reber*, 386 N.C. 153, 162 (2024).

## A. Medical Examiner Expert Testimony

First, Defendant argues that the trial court erred by allowing Dr. Lozano to opine that "shots fired from the vicinity of Defendant's vehicle killed" the victim.[2] Defendant claims that "the conclusion [could not] have been based on medical evidence" because "the autopsy results equally support[] the fatal shot being fired

---

[2] We note that Defendant does not explicitly challenge the trial court's admitting of Dr. Lozano as an expert or his testimony as a whole, but only the admissibility of his opinion as to the bullet's directionality. To the extent that Defendant purports to challenge Dr. Lozano's expert designation, we deem those arguments abandoned. *See* N.C.R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned"); *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402 (2005) (per curiam) (It "is not the role of the appellate courts . . . to create an appeal for the appellant.").

from the passing car." He believes that Dr. Lozano's testimony (1) "was not helpful to the jury" because "it was based on his interpretation of a video which had been published to the jurors[,] allowing the jurors to come to their own conclusions"; (2) "influenced the jury to disregard the defense's [own] interpretation"; and (3) "violated the Rules of Evidence and Defendant's constitutional rights to due process and a fair trial."[3]

### 1. Error Preservation

As a threshold matter, we must consider whether Defendant properly preserved this issue for appellate review. To "preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make." N.C. R. App. P. 10(a)(1). Defendant challenges multiple aspects of Dr. Lozano's testimony but seems to focus on the statement that the gunshots "were all occurring in the same proximity, so it is likely it occurred from those shots right there." Defendant objected to tendering Dr. Lozano as an expert in pretrial proceedings but not when he testified as to the bullet's directionality. To preserve "a trial court's decision to admit testimony," a party must contemporaneously object at "the time such testimony is offered into evidence and not made only during a hearing out of the jury's presence

---

[3] Because Defendant failed to raise this constitutional argument at trial, he cannot raise it for the first time on appeal. A "purported error, even one of constitutional magnitude, that is not raised and ruled upon in the trial court[,] is waived and will not be considered on appeal." *State v. Anderson*, 355 N.C. 136, 142 (2002). Defendant thus waives his constitutional argument.

prior to [its] actual introduction." *State v. Ray*, 364 N.C. 272, 277 (2010). Because

Defendant did not do so in the trial itself, we address his argument only for plain

error.

### 2. *Testimonial Admission*

To admit expert testimony under N.C. Evidence Rule 702(a), the trial must

conduct a three-step inquiry to determine whether (1) "the testimony is relevant," (2)

"the expert is qualified," and (3) "the testimony is reliable." *State v. Corbett*, 376 N.C.

799, 824 (2021) (citing *State v. McGrady*, 368 N.C. 880, 892 (2016)). Rule 702 provides

a three-part test for determining whether a witness can be qualified as an expert:

> (a) If scientific, technical or other specialized knowledge will assist the [jury] to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> (1) The testimony is based upon sufficient facts or data.
>
> (2) The testimony is the product of reliable principles and methods.
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. R. Evid. 702(a) [hereinafter Rule].

Expert testimony must "provide insight beyond the conclusions that jurors can

readily draw from their ordinary experience." *State v. Daughtridge*, 248 N.C. App.

707, 721 (2016) (quoting *McGrady*, 368 N.C. at 888) (emphasis omitted); *see* Rule 401

(minimum relevancy requirements). While the expert's "area of inquiry need not be

completely incomprehensible," his "testimony must do more than invite the jury to

substitute the expert's judgment of the meaning of the facts of the case for its own" to be helpful to the jury. *Id.*

Defendant invokes *State v. Daughtridge* to argue that "whether an expert's opinion is based on non-medical evidence is a valid Rule 702 question." In *Daughtridge*, a forensic-pathology expert testified to a victim's manner of death, relying primarily "on statements from law enforcement officers about the results of their investigation." *Daughtridge*, 248 N.C. App. at 722. The expert based his opinion on statements "relayed to [him] by law enforcement." *Id.* During cross-examination, he admitted that "[*no*]*thing about the wound itself* . . . would indicate . . . self-inflict[ion]." *Id.* at 723 (emphasis added). This Court acknowledged the defendant's "legitimate concerns" that the expert's opinion was "largely—if not entirely—based on his interpretation of non-medical information conveyed to him by law enforcement officers who were involved in the investigation." *Id.* at 722.

But it further explained that, while the expert "*would* have been qualified to provide an opinion . . . based on the type of evidence that was *within his area of expertise* as an expert witness in the field of forensic pathology," he was unqualified to provide his "opinion on this *specific issue*." *Id.* at 723 (emphases added). The Court recognized that the expert's testimony relied not on "medical evidence but instead on statements from law enforcement officers about the results of their investigation— information that bore little, if any, connection to his own observations stemming from his autopsy." *Id.* Because the State failed show the expert "was in a better position

than the jurors to evaluate . . . the results of the officers' investigation," this Court held that the trial court erred in admitting the expert's testimony. *Id*. at 724. The *Daughtridge* Court nonetheless concluded that the error was harmless because the defense counsel mitigated any potential prejudicial effect on cross-examination where the expert's "admissions would have led a reasonable juror to place his opinion on the manner of death in its proper context." *Id*. at 728.

Under *Daughtridge*, the "primary focus" of the reliability inquiry is "the witness's principles and methodology," not "the conclusions they generate." *Id*. at 721; *see McGrady*, 368 N.C. at 888. Thus, once "the trial court makes a preliminary determination that the scientific or technical area underlying a qualified expert's opinion is sufficiently reliable (and, of course, relevant), any lingering questions or controversy concerning the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility." *State v. Turbyfill*, 243 N.C. App. 183, 195 (2015) (quoting *Howerton v. Arai Helmet Ltd.*, 358 N.C. 440, 460 (2004)).

Here, the trial court preliminarily qualified Dr. Lozano as an expert in forensic pathology. At this point, we assume *arguendo* that Dr. Lozano's testimony as to the bullet's directionality was inadmissible under Rule 702. Because Defendant must show this error is prejudicial, we now turn to that analysis. *See State v. Wilkerson*, 363 N.C. 382, 415 (2009); *see* N.C.G.S. § 15-1443(a) (Defendant's burden to show prejudice). Like *Daughtridge*'s defense counsel, Defendant's counsel also mitigated any potential prejudice on cross-examination. Dr. Lozano admitted "that the medical

evidence was consistent with both the State's argument and the Defendant's argument." He also admitted that he "may have said that [he] guessed" in his first autopsy and that the victim's exit wound could also be an entrance wound. Dr. Lozano's admissions here, like the expert's in *Daughtridge*, "would have led a reasonable juror to place [his] opinion . . . in its proper context." *Daughtridge*, 248 N.C. App. at 728. Furthermore, the trial court instructed the jurors that they were "not required to accept" Dr. Lozano's testimony and should instead consider whether his "opinion is supported by facts" from the evidence, demonstrating the jury's ability to properly weight his testimony amid inconsistencies. N.C.P.I.—Crim. 104.94. For this reason, Defendant failed to show prejudice. Therefore, this Court holds that the trial court did not plainly err.

## B. Detectives' Lay Testimony

Second, Defendant argues that the trial court erred by "allowing the detectives to instruct the jurors on what they should be seeing in a gray-tone and murky video when what was or was not discernable in the video was properly in the province of the jury." For the following reasons, this Court similarly holds that the trial court did not plainly err.

Defendant acknowledges his failure to object to the admission of the detectives' testimony at trial and instead asserts that the trial court plainly erred by admitting that testimony. *See Reber*, 386 N.C. at 159. Because the "plain error" standard applies, Defendant must show that "the jury probably would have reached a different

result." *State v. Jordan*, 333 N.C. 431, 440 (1993). In any event, "[s]tatements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law, and a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review." *State v. Steen*, 226 N.C. App. 568, 575 (2013); *see State v. Chatman*, 308 N.C. 169, 177 (1983) (holding that defendant could not challenge testimony elicited during defense counsel's cross-examination of State's witness); N.C.G.S. § 15-1443(c) (defendant is not prejudiced "by error resulting from his own conduct.").

Here, Defendant challenges the detectives' ability to "instruct the jury on what is discernible in the video," after having elicited nearly identical information himself. On cross-examination, Defendant's counsel engaged in similar colloquies with the detectives, asking a series of questions conveying their version of the narrative of the murder as it unfolded in the video. As a result, Defendant cannot show the necessary prejudice.[4]

Assuming *arguendo* that the trial court erred in allowing the detectives' testimony, however, this error does not rise to plain error where the State presented substantial evidence of Defendant's guilt, including the video itself. *Lawrence*, 365

---

[4] Defendant raises the same challenge regarding Detective Styers's testimony that Defendant was outside the car at the time of the shooting. But defense counsel elicited similar testimony from Detective Styers by asking him, "[W]ho do you say was in that car?," followed by "Where was my client?" We hold no error on the same basis.

N.C. at 519 (a defendant cannot show plain error where evidence is "overwhelming and uncontroverted"). Had the trial court excluded the detectives' testimonies, the State could have still introduced the video tending to show Defendant's commission of the murder, as it would still tend to show Defendant's arm extend towards the victim, several muzzle flashes project from his direction, and the victim fall over. In light of this and other substantial evidence of Defendant's guilt, this Court holds that the trial court did not plainly err.

## IV. Conclusion

For the reasons stated above, even if the trial court erred in allowing both Dr. Lozano and the detectives' testimonies, this Court holds that any error does not constitute plain error.

NO PLAIN ERROR.

Judges CARPENTER and GRIFFIN concur.

Report per Rule 30(e).